■ In the Matter of THEODORA Q. BRYANT et al., Respondents, v BOARD OF EDUCATION, CHENANGO FORKS CENTRAL SCHOOL DISTRICT, Appellant. [800 NYS2d 778]—

Lahtinen, J. Appeal from a judgment of the Supreme Court (Rumsey, J.), entered May 20, 2004 in Broome County, which granted petitioners' application, in a proceeding pursuant to CPLR article 78, to annul a determination of respondent terminating reimbursement of certain Medicare premiums.

The issue before us is whether respondent ran afoul of a statute aimed at protecting the health insurance benefits of school district retirees (see L 2003, ch 48) when it stopped reimbursing the cost of Medicare Part B coverage. Respondent notified its employees and petitioners, who are retired teachers or spouses of retired teachers, that it would no longer reimburse the cost of Medicare Part B premiums as of July 2003. At that time, respondent was reportedly reimbursing petitioners more than $100,000[1] per year for those premiums. Petitioners commenced this CPLR article 78 proceeding seeking to require respondent to continue to reimburse Medicare Part B premiums. Supreme Court granted the petition (4 Misc 3d 423 [2004]). Respondent appeals.

The relevant statute provides that "a school district . . . shall be prohibited from diminishing the health insurance benefits

---

1. In 2003, the monthly premium for Part B coverage was $58.70 per person, an amount that thereafter increased to $66.60 in 2004 and $78.20 in 2005.

provided to retirees and their dependents or the contributions such . . . district makes for such health insurance coverage below the level of such benefits or contributions made on behalf of such retirees and their dependents by such district . . . unless a corresponding diminution of benefits or contributions is effected from the present level during this period by such district . . . from the corresponding group of active employees for such retirees" (L 2003, ch 48). The progenitor of this statute was enacted in 1994 (*see* L 1994, ch 729) as the "interim recommendation" of the "Temporary Task Force on Health Insurance for Retired Educational Employees" with a purpose to "limit the risk of benefit reductions to educational retirees until the Temporary Task Force has made its final recommendations on this issue" (Governor's Approval Mem, 1994 McKinney's Session Laws of NY, at 3015). Although no comprehensive legislation ensued, clones of the 1994 statute have been enacted annually (*see* L 1995, ch 139; L 1996, ch 83; L 1997, ch 80; L 1998, ch 68; L 1999, ch 43; L 2000, ch 47; L 2001, ch 31; L 2002, ch 70; L 2003, ch 48; L 2004, ch 25; L 2005, ch 16).

When the statute was extended in 1996, the Assembly, in a memorandum setting forth the history of the issue, explained that "because [educational] retirees are not represented in the collective bargaining process, they are powerless to stop unilateral depreciation or even elimination of health insurance benefits once the contract under which they retired has expired," and added that "[c]learly, reimbursement for medicare premiums is within the protective ambit of these provisions" (Assembly Mem in Support, 1996 McKinney's Session Laws of NY, at 2049-2050). The 2003 extension was supported by a Senate memorandum observing that the law "protects retirees by in effect making them part of the collective bargaining process" and that "[t]he law does not . . . prevent school districts from taking cost-cutting measures, so long as these apply equally to active employees and retirees" (Senate Mem in Support, 2003 McKinney's Session Laws of NY, at 1624).

It is noteworthy that the parties apparently agree that, in 1990, the contract in effect between active employees and respondent included health insurance coverage under the Empire Plan and such plan *required* respondent to pay Medicare Part B. That year, a new contract was negotiated and health insurance coverage was changed to Blue Cross/Blue Shield (hereinafter BC/BS). Under the new contract and the concomitant new health insurance plan, there was no obligation for respondent to pay Medicare Part B. Also, commencing with the 1990 contract, retirees were specifically named in the contract as being covered

under the section addressing health insurance. Section 8.13 provided:

"It is further understood and agreed that there shall be included in the [health insurance] Plan:

"(1) retired employees (past and future) in the Plan at the 100/75 participation rate (exclusive of those retirees who accept employment wherein they have equal or better health care coverage); . . .

"(2) surviving spouse and dependents (as defined in the Internal Revenue Service Code) are coverable through payment by said spouse or dependent of 100% of the cost of the plan."

Similar language was included in the ensuing contracts included in the record.

It is apparent that at no time since 1990 has respondent been under a *contractual* obligation to reimburse Medicare Part B payments to either current employees[2] or retirees. Respondent's current superintendent averred that the making of such payments for retirees from 1990 to 2003 was done "gratuitously . . . due in part to administrative turnover and accompanying oversight and in part to the availability of sufficient funds." Moreover, petitioners have been and continue to be specifically provided for in the contracts since 1990. This addresses, in part, the concern expressed by both the Assembly and the Senate that retirees not be ignored in the collective bargaining process. These retirees have not been ignored.

Nevertheless, the broad language of the statute protects retirees from a diminution of health insurance benefits in the absence of a corresponding diminution exacted from active employees. It cannot be seriously contemplated, as suggested by respondent, that Medicare Part B should not be considered within the ambit of the statute. Medicare is a federal "medical insurance plan" for those who meet its criteria (*New York City Health & Hosps. Corp. v Bane*, 87 NY2d 399, 402 [1995]; *see Myers v City of Schenectady*, 244 AD2d 845, 846 [1997], *lv denied* 91 NY2d 812 [1998]; *Matter of New York State Radiological Socy. v Wing*, 244 AD2d 823, 823 [1997], *lv denied* 92 NY2d 802 [1998]) and, while the benefits of Part A (hospitalization) are provided at no extra charge, there is a fee for those participating in Part B (physician and outpatient services). Accordingly, it is evident that Part B coverage may comprise a component of health insurance coverage protected by the statute.

---

2. Current employees responded to respondent's action by filing a grievance and an improper practice charge. The arbitrator ruled against the current employees, finding no contractual obligation for Part B reimbursement.

However, the actual impact of respondent's action is not satisfactorily set forth in this record. For example, petitioners allege—with virtually no elaboration—that, "[u]pon information and belief," the decision to stop reimbursing Part B "constitutes a diminution of contributions made for retiree health insurance coverage."[3] In a response also lacking factual elaboration, respondent's superintendent states that "retirees continue to receive the same District contribution to health insurance premiums as they always enjoyed and their benefits have similarly not been reduced or otherwise impacted." Noticeably absent is any sufficient explanation from either party of the interplay between the current health insurance benefits afforded by BC/BS and the Part B coverage. An example of the importance of this interplay is reflected in our decision in *Myers v City of Schenectady* (*supra* at 846), where the municipality encouraged retirees to enroll in Part B because its health plan then became secondary, resulting in a reduction of premiums. If the retiree elected to participate in Part B, the municipality agreed to reimburse the retiree the cost of Part B coverage withheld from the Social Security benefit paid to the retiree.[4] Where the retiree did not elect to participate in Part B, he or she continued to receive "the same fully paid health insurance coverage as . . . eligible employees" (*id.*). If an analogous situation existed here and a retiree elected to participate in Part B, resulting in a reduction of respondent's obligation to pay a BC/BS premium, then a violation of the statute may be implicated by respondent's current action.[5] While speculation about many other possibilities could ensue,[6] it is adequate at this juncture to state that the record is insufficient to support the type of sweeping determination both parties seek. The parties each set forth broad allegations which—if supported by proven facts—could culminate in a favorable ruling. Neither

3. Indeed, virtually every paragraph of the petition is alleged "upon information and belief." The petition is verified by only one petitioner and neither the petition nor any other document in the record purports to set forth the actual dollars and cents impact upon any particular person, retired or otherwise.

4. Apparently, the cost of Part B coverage was less than the premium for physician and outpatient services charged by the health insurance provider, resulting in a net savings to the municipality.

5. Such a scenario could fall within the concern noted in the Assembly's 1996 memorandum in support of that year's extension of the statute.

6. We further note that no evidence or explanation was offered of the potential different impact on, among others, an active employee who was Medicare eligible and retirees who are not yet Medicare eligible. These facts may be relevant to the issue of whether there has been a diminution that falls solely on retirees.

party satisfactorily supported the allegations with evidence. From our review of this record, we are unpersuaded that petitioners have established that they are entitled to the relief they seek or that respondent has shown that the petition should be dismissed. The matter must be remitted for further development of the record (much, if not all, of which may be feasible by stipulated facts and documents which would necessarily include the BC/BS plan).

Finally, we note that we find no merit in respondent's assertion that *Matter of Aeneas McDonald Police Benevolent Assn. v City of Geneva* (92 NY2d 326 [1998]) requires reversal of Supreme Court's judgment as a matter of law. While that case permitted a unilateral reduction in health insurance benefits of a municipality's retirees, there was no statute analogous to the current one in effect. In essence, here, a statute designed as a short-term effort to maintain the status quo while a comprehensive solution was developed has, instead, slipped into the long-term policy for a problem with many complexities and competing equities. The suggestion of the New York State School Boards Association (appearing amicus curiae) that a modest adjustment for retirees will make available significant funds for educating children is best advanced to the Legislature. We are constrained by the language of the current statute and, under that statute, if petitioners establish an actual diminution that fell on them without an accompanying diminution to active employees, they will be entitled to relief.

Mercure, J.P., Carpinello, Mugglin and Rose, JJ., concur. Ordered that the judgment is reversed, on the law, without costs, and matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision. [*See* 4 Misc 3d 423 (2004).]